UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NETWORK ENTERPRISES, INC,                  :
                                                           :
                           Plaintiff,          :                    01 Civ.11765 (CSH)
                                                           :
           -against-                            :         POST-TRIAL OPINION, FINDINGS OF
                                                                    FACT AND CONCLUSIONS OF LAW:
APBA OFFSHORE PRODUCTIONS, INC.
and MICHAEL D. ALLWEISS,                 :
                                                           :
                           Defendants.        :
-------------------------------------------------------X

HAIGHT, Senior District Judge:

## I. PROCEDURAL INTRODUCTION

This is a diversity case for alleged breach of contract. The corporate plaintiff, a cable

television network, alleges that the corporate defendant breached a written contract to purchase time

from and exhibit programs on plaintiff's network. Plaintiff further alleges that the individual

defendant is personally liable for the damages resulting from the breach because the corporate form

of the corporate defendant should be disregarded.

Discovery had been completed and the case was scheduled for a jury trial. At that point

counsel jointly expressed the parties' desire to waive trial by jury and submit the case to the Court

for a bench trial. The record on the proposed bench trial would consist of written submissions. No

testimony would be taken or exhibits received in open court.

The Court accepted that proposal in principle but advised counsel that in practice the

documents submitted would have to be in a form allowing the Court to make the findings of fact and

conclusions of law mandated by Fed.R.Civ.P. 52(a). After further consultation and negotiations,

counsel for the parties submitted a Stipulation of Undisputed Facts, a Joint Submission of Trial Exhibits, a Joint Appendix to the Trial Briefs, and a trial brief on behalf of each party.[1]  These documents placed before the Court stipulated facts, pertinent documents agreed to be admissible in evidence, and the testimony of witnesses derived from depositions or, in the case of one witness, from a testamentary stipulation.

Having considered these submissions, the Court is satisfied that a sufficient trial record exists to allow it to make the requisite findings of fact and conclusions of law, and to render a valid judgment in the case.  Part II of this Opinion contains the Court's Findings of Fact.  Part III contains its Conclusions of Law.  Part IV provides for the eventual entry of judgment pursuant to Fed.R.Civ.P. 58.

## II.  FINDINGS OF FACT

### A.      Findings of Undisputed Facts[2]

_____ 1.  Plaintiff Network Enterprises, Inc. ("Network") is a Tennessee corporation with its principal place of business in Nashville, Tennessee.  At the pertinent times Network was in the business of running a cable and satellite television network then known as "TNN" or "The National Network."[3]  I will in these Findings refer to the plaintiff as TNN when that is the corporate name it was using at the time in question.

---

[1]  Defendants also submitted an Appendix to their trial brief.  That Appendix contains defendants' proposed findings of fact and copies of documents that are also included in the Joint Submission of Trial Exhibits and the Joint Appendix to the Trial Briefs.  Plaintiff's proposed findings of fact are included in its trial brief.

[2]  The Findings of Fact in Part II.A. of this Opinion are based principally upon the parties' Stipulation of Undisputed Facts, the Joint Submission of Trial Exhibits, and the Joint Appendix to the Trial Briefs.

[3]  Stipulation of Undisputed Facts (hereinafter "Stip. Facts") ¶ 1.

2. Defendant APBA Offshore Productions, Inc. ("Productions") is a Florida corporation with its principal place of business in St. Petersburg, Florida. At the pertinent times Productions was a marketing entity whose primary purpose was to generate sponsorships and produce television shows for APBA offshore racing.[4]

3. Defendant Michael D. Allweiss is a resident and citizen of the State of Florida.[5]

4. The initials "APBA" which appear in Productions' corporate name stand for the American Power Boat Association, a New York membership corporation that has been in existence since the early 1900s. The APBA was created by power boat racing enthusiasts to establish rules governing the various racing classes and organize power boat races. There are nine or ten categories of power boat racing sponsored by the APBA, including the offshore racing category.[6]

5. In 1988 Allweiss graduated from the University of Miami Law School. In 1995 he was appointed to the national legal committee of the APBA. In 1996 the APBA appointed Allweiss the general counsel for the offshore category. Allweiss served as the chairman of the offshore racing category of the APBA for the 1999 season.[7]

6. Before Allweiss became chairman of the APBA offshore racing category, power boat racing was not widely televised.[8]

---

[4] Stip. Facts ¶ 2.

[5] Joint Appendix to Trial Briefs ("Jt. App.") Ex. 5, deposition of Michael D. Allweiss conducted on December 3, 2003, at Tr. 4-7 (hereinafter "Allweiss Dep.").

[6] Stip. Facts ¶¶ 12, 13.

[7] Jt. App. Ex. 5, Allweiss Dep. Tr. 5; Stip. Facts ¶ 14.

[8] Stip. Facts ¶ 16.

7. In 1999 Allweiss formed Productions. He drafted Productions' articles of incorporation and at all pertinent times was the corporation's sole officer, director and shareholder. During its operation, Productions utilized the same office address as Allweiss's Florida law practice.[9]

8. As an enclosure to a letter dated March 23, 1999, an employee of TNN sent to Allweiss at Productions "a fully executed copy" of an otherwise undated Time Buy Agreement between TNN and Productions, pursuant to which Productions purchased time on TNN to televise programs highlighting its power boat races during 1999. TNN broadcast that programming in compliance with that contract and was fully compensated in accordance with its terms.[10]

9. In or around January 2000, Productions and TNN reached a "handshake agreement" for a new television arrangement for the upcoming 2000 season.[11]

10. On August 21, 2000, TNN and Productions executed a Time Buy Agreement ("the 2000 Agreement" or "the Agreement"), drafted by TNN to memorialize the 2000 handshake agreement, pursuant to which Productions would broadcast on TNN ten half-hour episodes, each highlighting an APBA Offshore National Race, during consecutive weeks from September 30 through December 2, 2000. The Agreement identifies APBA Offshore Productions, Inc. as "the Purchaser." The first paragraph of the Agreement recites that "Purchaser agrees to purchase the herein described time on TNN in accordance with the Basic Provisions set forth below and the attached General Terms and Conditions together with any Riders thereto." The Basic Provisions comprise the first three pages of the Agreement. They are introduced by the sentence: "These Basic Provisions (the **"Basic**

---

[9] Stip. Facts ¶¶ 2, 3, 11, 17.

[10] Joint Submission of Trial Exhibits ("Jt. Trial Ex.") Ex. 1; Stip. Facts ¶ 18.

[11] Stip. Facts ¶ 19.

4

**Provisions")** contain certain material terms of agreement between TNN and Purchaser with regard to the purchase of certain time on TNN in order to air the Programs as hereinafter defined." The Basic Provisions include, under the caption "Description of Time Purchased," the dates and time of day of the ten telecasts contracted for. The dates are "September 30, October 7, 14, 21, 28, November 4, 11, 18, 25, and December 2, 2000." The time of day for each date is "11:30 a.m. - 12:00 p.m. eastern/pacific time." The parties' signatures appear on the third page of the Agreement, Allweiss signing as "Chairman/Pres." of "APBA Offshore Productions, Inc." The attached General Terms and Conditions comprise pages 4-13 of the Agreement. ¶ 24 of the General Terms and Conditions provides in part: "This Agreement may be amended only by a written instrument duly executed by all parties." ¶ 26 provides in part: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed wholly therein." [12]

11. The 2000 Agreement also included a Renewal Option Rider ("the Renewal Option"), on a separate page initialed by officers of TNN and by Allweiss on behalf of the "Purchaser," an entity identified on page 2 of the Agreement as Productions. The Renewal Option provided in its entirety as follows:

> TNN hereby grants to Purchaser the option to exhibit up to thirteen (13) additional original Episodes over TNN's cable programming service from October 1, 2001 through December 31, 2001, under the same terms and conditions as this Agreement at a fee of Forty Thousand Dollars ($40,000.00) per Episode. The dates and times of such telecasts shall be mutually agreed to by the parties hereto. Such option shall be executed, if at all, by Purchaser delivering notice thereof to TNN which notice shall be received by TNN no later than

---

[12] Stip. Facts ¶ 30; Jt. Trial Ex. 2.

March 1, 2001.[13]

12. All of Productions' obligations under the 2000 Agreement with respect to television broadcasts during 2000 were fulfilled.[14]

13. Although as noted in Finding No. 10 the 2000 Agreement was signed on August 10, 2000 and listed TNN and Productions as the parties, in fact Productions stopped actively conducting business in February 2000, at or around the time a license arrangement was formalized between the APBA and an entity known as APBA Offshore Power Boat Racing, LLC ("the LLC"). Allweiss and five or six investors had formed the LLC to secure a license from the APBA to take the offshore racing category private and operate, manage, market and sell the sport in exchange for an annual licensing fee.[15]

14. On March 6, 2000, Allweiss withdrew the remaining $50,214.92 in funds from Productions' bank account as partial reimbursement of his loans to Productions and deposited the funds into LLC's account as his paid-in capital. The other five or six shareholders put investment capital into the LLC of $100,000 each. After the LLC was created, it utilized the same Florida address as Allweiss's law practice.[16]

15. Allweiss never told TNN about the withdrawal of the funds from Productions' bank account.[17]

---

[13] Stip. Facts ¶ 31; Jt. Trial Ex. 2.

[14] Stip. Facts ¶ 32.

[15] Stip. Facts ¶¶ 20, 21.

[16] Stip. Facts ¶¶ 22, 23.

[17] Stip. Facts ¶ 24.

16. A sum of $100,000 previously provided to Productions by a sponsor was transferred to the LLC, since this money was a pre-payment for a 2000 sponsorship that the LLC, and not Productions, would now fulfill.[18]

17. Under the license that the LLC held from APBA, the LLC, unlike Productions, was responsible not only for securing sponsorships and producing television, but also for all other activities related to functioning as a professional motor sports business.[19]

18. Once the license agreement between the LLC and APBA was implemented, there was no more reason for Productions to do anything on a day-to-day basis, although it remains as a lawfully existing company under Florida law.[20]

19. Neither Allweiss nor anyone else advised TNN of the formation of the LLC and the manner in which it had supplanted Productions. And, as previously noted, Allweiss never told TNN about the withdrawals of the funds referred to from Productions' bank account.[21]

20. At one time an individual named David Hall had been employed at TNN. But by November 2000 Hall had left TNN and was acting as a consultant to Allweiss and the LLC. At that time Allweiss and Hall began having discussions with Brian Hughes, a TNN officer whose title was Senior Vice President of Sports and Outdoors, regarding bringing all of the offshore programming over to TNN and doubling the number of shows, as well as doing a combination barter deal rather

---

[18] Stip. Facts ¶ 26.

[19] Stip. Facts ¶ 28.

[20] Stip. Facts ¶¶ 28, 29.

[21] Stip. Facts ¶¶ 33, 34, 24.

than a time buy deal.  The existence of the LLC was not known to TNN at that time.[22]

21.  In the succeeding months, Allweiss and Hall on behalf of the LLC (whose existence was still unknown to TNN) had continued conversations with Hughes about replacing the 2000 Agreement then in effect between TNN and Productions with a new or altered deal with TNN.[23]

22.  On February 23, 2001, Allweiss faxed to Hughes at TNN a letter on the letterhead of "APBA Offshore Racing" which stated:

> As you know, David Hall and I have been discussing with you since December the restructuring of the APBA Offshore television relationship for 2001. I realize we are very close to striking a new and exciting deal for both of us but, unfortunately, my renewal option under the 2000 agreement expires on March 1, 2001.  Consequently, I sincerely would appreciate a thirty (30) day extension of the renewal option to give us sufficient time to finalize our new deal.[24]

23.  Hughes replied by a letter to Allweiss dated February 28, 2001, which stated:

> In everyone's best interest, rather than proceeding as you referenced in your FAX, I would simply operate pursuant to your contract, with the understanding that we will continue to pursue the altered deal David and I have discussed.  I should have word by the first of next week.  However, in the event that the proposal is rejected, the fallback would in fact be what is earmarked in the present agreement.[25]

24.  Allweiss responded with a faxed letter to Hughes dated March 1, 2001 which read:

> Thank you for your correspondence dated February 28, 2001.  As you know, the proposed new deal we have been discussing calls for thirteen shows, a payment of $200,000 by APBA Offshore, and three

---

[22]  Stip. Facts ¶ 33.

[23]  Stip. Facts ¶ 34.

[24]  Stip. Facts ¶ 35, Jt. Trial Ex. 13.

[25]  Stip. Facts ¶ 36, Jt. Trial Ex. 14.

minutes of commercial inventory per show for us.  Since we have not
finalized the deal, however, and the option to renew last year's deal
expires today, I hereby exercise the option in accordance with the
contract.[26]

25.  After this exercise of the Renewal Option contained in the rider to the 2000 Agreement,

Allweiss and Hall continued to have discussions with Hughes about a new deal.  Also, in or about

July 2001, Allweiss had discussions with Hughes concerning the broadcast schedule for the 2001

telecasts.[27]

26.  On August 7, 2001 Mary Beth Pacisi, a "Legal Administrator" at TNN, addressed to

Allweiss at "APBA Offshore Productions, Inc." in St. Petersburg, Florida a letter bearing that date

and captioned: "Amendment to the Time Buy Agreement for '*APBA Offshore National Races*.'"

The text of the letter read in full:

Enclosed please find three (3) originals of the referenced amendment
to the agreement between APBA Offshore Productions, Inc. and
Network Enterprises, Inc.  Please sign each of the originals and return
them to my attention.  I will see that you receive an original for your
files.

I can be reached at 615/457-7522 if you have any questions.

The letter enclosed three one-page documents bearing the caption appearing at the head of the letter,

as well as copies of the 2000 Agreement including the Renewal Option Rider.  The text of the

document began by saying:

THIS AMENDMENT ("Amendment") dated August 7, 2001,
modifies the Time Buy Agreement dated August 21, 2000 (the
"Agreement") by and between NETWORK ENTERPRISES, INC.,
d/b/a TNN ("TNN") and APBA Offshore Productions, Inc.

---

[26]  Stip. Facts ¶ 38, Jt. Trial Ex. 15.

[27]  Stip. Facts ¶¶ 39, 40.

("Purchaser") and supersedes conflicting provisions contained in the Agreement.

The Amendment then provided:

> 1. For the year 2001, the Description of Time Purchased in the Basic Provisions shall be amended to read as follows:
>
> **Description of Time Purchased in the year 2001:**
> **Dates:** Ten consecutive Sundays beginning on September 30, 2001 and ending on December 2, 2001.
> **Time of Day:** 11:30 a.m. eastern/pacific
> **Exclusivity to TNN:** Yes, during the above exhibitions.
>
> 2. In all respects not inconsistent with this Amendment, the Agreement is hereby ratified and affirmed in its entirety. Upon the execution hereof by both parties hereto, this Amendment shall be attached to and become a part of the Agreement.
>
> IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

Lines then appeared for signatures by officers of Network and Productions.[28]

> 27. On August 9, 2001 Hughes sent Allweiss an e-mail which read:
>
> Michael: You should have received a letter today that reflects our conversations of a few weeks ago. If you would, please review ASAP and get it back to us. Looking forward to seeing the first show. Hope you are well. Regards, Brian.

Hughes was referring to Pacisi's letter to Allweiss dated August 7.[29]

> 28. In August or September, 2001, as the initial broadcast date of September 30 specified

in the Amendment to the 2000 Agreement prepared by TNN and forwarded to Allweiss approached,

it became clear to Allweiss that TNN would not offer an acceptable "new" or "altered" deal that had

---

[28] Stip. Facts ¶ 41, Jt. Trial Ex. 16.

[29] Stip. Facts ¶ 42, Jt. Trial Ex. 17.

been the subject of prior discussions involving Allweiss, Hall and Hughes.  Allweiss thereupon

convened the board of the LLC, which decided not to broadcast  its programming on TNN.  Instead,

the LLC board decided to expand an existing television arrangement with a previously acquired

broadcast partner called SpeedVision.[30]

29.  Allweiss sent Hughes a letter dated September 21, 2001 which he signed as "Chairman"

of "APBA-Offshore Power Boat Racing, LLC."  That letter read:

> As you know we never reached a formal agreement regarding the air
> dates and times for the APBA Offshore programs.  Unfortunately,
> circumstances are such now that we do not believe it is possible to
> formalize an agreement this year, and we have decided to go in a
> different direction.  We wish you and TNN the best of luck in the
> future.[31]

30.  Hughes responded in a letter to Allweiss dated September 24, 2001, which read:

> I received your Fax of Friday this morning and was no doubt
> surprised by its content.  We had agreed to an air schedule and you
> have the amendment sent by our Legal Department.
>
> Before I turn this over to our Legal Department, I would like to
> discuss all this with you.  In the absence of your signing the
> amendment of August 7th, sent via overnight courier to you, which
> was in fact *our* understanding, I have attached a copy of your March
> 1 letter exercising your option in accordance with the signed contract.
>
> Please call me prior to close of business today.[32]

31.  What transpired next was a predictable exchange of lawyers' letters.  Counsel for

Network/TNN sent Allweiss a letter dated September 26, 2001 which asserted in part that "you

---

[30]  Stip. Facts ¶ 43.

[31]  Stip. Facts ¶ 44, Jt. Trial Ex. 20.

[32]  Stip. Facts ¶ 45, Jt. Trial Ex. 21.

ultimately agreed orally with Brian Hughes to terms memorialized in a subsequently delivered written Amendment to the Time Buy Agreement for 'APBA Offshore National Races'"(referred to in these Findings as the 2000 Agreement).[33]  The responding lawyer's letter dated September 28 was signed by Allweiss, who as noted is an attorney (although he signed the letter as "Chairman/CEO" of "APBA Offshore Power Boat Racing, LLC").  Allweiss asserted in part that "I never agreed with Mr. Hughes, verbally or otherwise, to the air dates and times" set forth in the Amendment TNN sent to him on August 7.[34]  This action was then commenced.

## B.    Further Findings of Fact

32.  From these stipulated facts and exhibits a decisive factual issue clearly emerges, although the parties state it somewhat differently in their trial briefs.  Plaintiff's brief says at 2 that "the solitary issue in this case is whether, pursuant to that exercised option, the parties reached an agreement as to the specific dates and times for the broadcast of Productions' programming in 2001."  Defendants' brief says at 2 that "[n]o binding contract exists since the parties never agreed upon the material terms of the Renewal Option Rider," by which counsel mean "the times, dates, and number of telecasts," *id*. at 14.  These further Findings of Fact address that issue.

33.  The evidence in the trial record that bears upon this issue comes from two witnesses:  Brian Hughes and Michael Allweiss.[35]  Hughes's testimony takes the form of a stipulation that, if

---

[33]  Stip. Facts ¶ 46, Jt. Trial Ex. 22.

[34]  Stip. Facts ¶ 47, Jt. Trial Ex. 23.

[35]  The record contains the deposition of two additional witnesses, Lynn Eason and Karen Steinmetz.  At the pertinent times Eason was a legal assistant at Allweiss's law firm and Stenimetz was an independent CPA who worked on the financial books generated by Allweiss's APBA-related activities.  Neither witness testified concerning the question of whether or not the parties reached agreement on the dates and times of the telecasts contemplated by the Renewal Option which

called as a trial witness, Hughes would testify in accordance with the contents of the stipulation.[36] The testimony of Allweiss takes the form of two affidavits and a deposition conducted by plaintiff Network's counsel. Counsel for defendants attended the deposition but asked no questions of his own.

34. It must be acknowledged that for the fact finder (jury or judge), these forms of trial testimony contain inherent limitations. Hughes's stipulated testimony is not subject to testing, amplification or clarification by cross-examination or by questions by the Court.[37] Allweiss's affidavits cannot be cross-examined, and his deposition constitutes an effort by opposing counsel to develop evidence helpful to the plaintiff and harmful to Allweiss and the corporate defendant; trial lawyers defending depositions are frequently content to have hostile depositions run their course without asking any questions, and so it came to pass in this case. At a trial, Allweiss's evidence would have been more fully developed on direct and cross-examination, and perhaps by further questions by the Court. But this is the trial record upon which the parties have agreed, and the Findings of Fact which appear *infra* are perforce based upon it.

35. Hughes's account of the facts bearing upon the point at issue appears in its entirety at

_____

Allweiss exercised in his March 1, 2001 letter to Hughes.

[36] The stipulation of Hughes's testimony is Tab 2 to the Joint Appendix to the Trial Briefs. The stipulation is dated September 1, 2005. It appears that while at the pertinent times Hughes was the plaintiff's officer in charge of the negotiations with defendants, he had subsequently left the company's employ, so that the plaintiff presumably could not compel Hughes's attendance at a trial.

[37] My practice as a trial judge is to withhold questions of substance until counsel for both parties have finished their examinations of a witness, and then put such additional inquiries as it seems to me a full elucidation of the facts requires. In a jury trial it is, of course, important for the judge to stress to the jury that any questions the judge may have asked should not be regarded as any indication of how the Court thinks questions of fact should be decided, a precaution whose necessity does not arise in a bench trial.

¶¶ 15-17 of his stipulated testimony:

> Following Productions' exercise of its option to broadcast the 2001 offshore power boat races on TNN, the parties engaged in discussions to solidify the details of those broadcasts.

> By July 2001, discussions between the parties had resulted in the specific scheduling of defendant's programming in ten (10) half-hour segments to run on Sundays from 11:30 a.m. to 12:00 p.m. for ten consecutive weeks from September 30 through December 2, 2001, and, in reliance on that mutual understanding, TNN reserved those spots on its schedule.

> On or about August 7, 2001, TNN's legal department forwarded to Mr. Allweiss a formal, written "Amendment To The Time Buy Agreement For 'APBA Offshore National Races'" which memorialized the scheduling to which the parties had agreed in the discussions that culminated in July 2001.

In this last paragraph, Hughes is referring to Pacisi's letter to Allweiss and the enclosed amendment quoted in Finding of Fact ¶ 26.

36. Allweiss was deposed by counsel for Network/TNN on December 3, 2003. Jt. App. Tab 5. He executed affidavits in connection with summary judgment motions on January 27, 2004 Jt. App. Tab 3, and February 24, 2004, Jt. App. Tab 4. Only the first of the two affidavits (hereafter "Allweiss Affid.") deals with the point at issue. In his deposition and his first affidavit, Allweiss flatly contradicts Hughes's assertion that the parties had agreed, by July 2001 or at any other time, on the number of broadcasts to be produced pursuant to the Renewal Option, or the dates and times of such broadcasts. However, before examining Allweiss's testimony in detail, it is necessary to consider another topic of conversation between Allweiss and Hughes that was taking place during the same period in 2001.

37. Hughes says in his stipulated testimony at ¶¶ 7-8:

> Leading up to the [Renewal Option] March 1, 2001 deadline, Productions, through Mr. Allweiss, attempted to negotiate a television deal with TNN, through Mr. Hughes, that was different from the terms spelled out in the Renewal Option Rider.

> Productions and TNN did not reach an agreement on any television deal different in terms from the Renewal Option Rider.

The parties do not dispute that such negotiations were taking place. Allweiss says that he exercised the Renewal Option "because I wanted to make sure that Network Enterprises, Inc. would continue its dialogue with me regarding the possibility of reaching a more extensive agreement than that set forth in the Renewal Option Rider." Allweiss Affid. ¶ 13. Allweiss described the details of the proposed new agreement during his deposition, but for the purpose of these Findings it not necessary to recount them. It is sufficient to note that it is those negotiations that were referred to in Allweiss's letter dated February 23, 2001, *see* Finding of Fact 22 ("restructuring"); Hughes's letter to Allweiss dated February 28, 2001, *see* Finding of Fact 23 ("the altered deal"); and Allweiss's letter to Hughes dated March 1, 2001, *see* Finding of Fact 24 ("the proposed new deal").

38. These parallel negotiations also form the context for an exchange of e-mails between Hughes and Allweiss to which the parties' briefs give somewhat different interpretations. As noted in Finding of Fact 27, on August 9, 2001, a Thursday, Hughes sent an e-mail to Allweiss captioned "Follow up," and which for the sake of the present context I will quote again:

> Michael: You should have now received a letter today that reflects our conversations of a few weeks ago. If you would, please review ASAP and get it back to us. Looking forward to seeing the first show. Hope you are well. Regards. Brian.[38]

Allweiss responded in an e-mail to Hughes sent on Friday, August 10. The e-mail stated that

---

[38] Jt. Trial Ex. 17. I identify August 9 as a Thursday because that is what the top of the e-mail says.

Allweiss was "in Cleveland for a Pro Series event this weekend," and then read:

> I understand that TNN has told WOO and ASA that they are getting
> out of motorsports but is keeping Monster Trucks. Can you please
> advise where APBA Offshore fits in this equation? While I realize
> that our $2+million investment in TNN programming the last three
> years is not huge to TNN it is a very big deal to me so I am hopeful
> that we can get a definitive answer from you as to the networks plans
> for our product. Your help would be greatly appreciated. Thank
> you.[39]

Hughes responded to Allweiss in an e-mail sent on Sunday, August 12. The e-mail begins with a

lengthy analysis by Hughes of the current state of sports television programming as evaluated by

TNN, which I need not quote. The e-mail concluded:

> So, all this said, I am certainly not telling you anything that you
> probably don't already know. However, perhaps it brings things into
> clearer perspective. Again, I think that properties such as yours,
> various Motorcross and Monster Truck properties are much more
> conducive to the TNN brand today and into the future. However,
> only the next four to six months will define that more decisively.
> Thus, I told you that I will most certainly give you my honest opinion
> well in advance of your needing to make decisions for next year.
> Hopefully, the company will have a perspective prior to that, and
> hopefully it will be a positive one. At worst, you can blow out of here
> with another deal if things don't look favorable.[40]

39. It is in the context of these continuing and parallel negotiations that Allweiss testified

at his deposition about the Renewal Option in the 2000 Agreement. Allweiss described his then-

existing perceptions as follows:

> [I]f they don't agree on a new deal, then we are simply back on the
> old deal. The old deal says specifically, clearly and unambiguously
> that we have to ultimately agree on the dates and times of telecasts for
> 2001. So the fallback position is: Hey, we've got this contract. The

---

[39] Jt. Trial Ex. 18.

[40] Jt. Trial Ex. 19.

contract says that we've still got to agree on the dates and times of such telecasts, and we will use that to continue the negotiations because it was what we believed from all of our discussions with Brian and including this [February 28, 2001]letter [from Hughes to Allweiss] was that he was negotiating with us  in good faith and we would continue to discuss the – a new deal, a new and better deal.

  So he says "fallback."  My fallback position was: Well, if we can't agree on dates and times for these 13 shows that are going to air, then we don't have a deal and we're out of here.  And that's ultimately what happened.[41]

                    *********************

I was having many conversations over and over again with Brian to get him to continue what he promised to consummate, which was our discussions about a new deal. . . . In and around late July Brian calls me all nice and sweet trying to sell me on the idea of putting our shows on Sunday at 11:30 because that – you know, Sunday is just a better day for motor sports.  And I say to him, "Brian, what about our future long-term deal? We've never come up with that.  We've never agreed upon that What are we doing?

  Brian was – continued to tell me that "We are going to continue to work on that, and before your shows air this fall we will have – we will know the position that we're all going to be in."

  "Not a problem, Brian, but time is running out."

  So Brian, without my telling him to do it, without my agreeing with him at all, tries to slide me this letter dated August 7th with a proposed amendment to the Time Buy Agreement for APBA Offshore National Races.   And in the proposal the only substantive change, lo and behold, in this amendment related to the dates and time.

  Remember the material terms that your contract also says, if you amend the material term it's got to be done in writing?  He knows that that's a material term, the date and time, and he tries to slide me this letter along with this amendment and get me to sign it.  And I never did sign it.  And I told him I wasn't going to sign it because I don't agree to it.  "I'm not going to take this deal that you're shoving

41  Allweiss Dep. Tr. 181-182.

in front of my face."[42]

*********************

Q. Now going back to the July conversations with Brian, what was he saying to you, as best you can recall, and what were you saying to him? What were the nature of the conversations?
A. For the most part, they were very brief and they were pretty well-oriented to my asking Brian, "When are we going to get a new deal?"

Q. And what was his answer to that question?
A. He kept assuring me that "We – we're going to continue to work on it. . . . You – we will know well before – well before your programs are scheduled to air in September."

Q. Whether you would have a new deal?
A. No, it wasn't even a – no, it wasn't a question of whether we were going to have a new deal. It was what was the new relationship, the extended relationship going to be.

Q. Okay. And with respect to the airing of the 2001 programming, did you discuss that?
A. We probably did.

Q. What do you recall about those conversations?
A. They were, for the most part, one-sided. But, you know, again, our whole idea was that if the future deal was good enough, since we controlled the option, if we got a good future deal and it made sense that we would – you know, whatever the deal would be for 2001, we would make an assessment. And if the deal for the future was good, we probably would have just agreed to whatever we could have gotten and gone forward.

Q. Okay, With respect to the 2001 programming, did Brian raise with you the issue of a need to set the dates and times?
A. Yes.

******************

Q. Did you get a sense of his urgency?
A. I started to get a sense of his urgency back in July when it was

---

[42] Allweiss Dep. Tr. 189-191.

18

pretty clear that he wasn't going to be able to give me an answer on what the future was and I wasn't giving him an answer on what our dates and times were going to be.[43]

40.  The month after giving this deposition testimony, Allweiss executed his first affidavit, which deals with these events and perceptions as follows:

> 13.  When I caused the exercise of the Renewal Option Rider to the 2000 Time Buy Agreement, it was my understanding that there was no firm or enforceable deal yet in place because there was no agreement on the times or dates for the broadcast of the additional telecasts.  I caused the execution of the Renewal Option Rider because I wanted to make sure that Network Enterprises, Inc. ("Network") would continue its dialogue with me regarding the possibility of reaching a more extensive agreement than that set forth in the Renewal Option Rider.

> 17.  On or about August 7, 2001, Network sent me a proposed amendment to the 2000 Time Buy Agreement specifying the dates and times and number of telecasts to be broadcast pursuant to the Renewal Option Rider.

> 18.  The dates, times and numbers of telecasts in the August 7, 2001 'Amendment' had not been agreed upon by me or by Productions.

> 19.  I caused a proposed TNN broadcast schedule for 2001 to be put on the APBA offshore racing web-site to satisfy our sponsorship obligations and show TNN we were interested in continuing doing business with them.

> 20.  Nevertheless, neither Productions nor I ever came to any mutual oral or written understanding with Network regarding the dates, times and number of telecasts to be broadcast pursuant to the Renewal Option Rider.

> 21.  Network never made a specific proposal for a long term agreement for broadcasting offshore racing on TNN, nor did it ever say that no proposal or deal on a long term agreement would be forthcoming.

---

[43]  Allweiss Dep. Tr. 211-214.

41. Allweiss never signed on behalf of Productions and returned to Network the Amendment to the 2000 Agreement which Pacisi had sent to Allweiss as an enclosure to her letter dated August 7, 2001.

42. In or about July 2001, TNN reserved on its telecasting schedule spots for ten half-hour APBA offshore power boat racing telecasts, to be supplied by Productions and shown on the TNN network on ten consecutive Sundays from 11:30 a.m. to 12:00 noon, beginning on September 30, 2001, those being the dates and times specified in the August 7 proposed amendment. *See* Finding of Fact 35. Allweiss did not advise Hughes that Productions would not furnish those telecasts or use those date and time spots until his letter to Hughes dated September 21, 2001. *See* Finding of Fact 29. Allweiss's action compelled TNN to find substitute programming for the ten Sunday time slots. Given the late date of Allweiss's notice, TNN could not find substitute programming of equivalent value. Indeed, TNN was unable to obtain any paid substitute programming, and was forced, in order to avoid "dead air," to take programs from the network's existing inventory and rebroadcast them.[44]

43. The 2000 Agreement and the Renewal Option each provided that Productions would pay TNN a fee of $40,000 for each telecast. Since TNN claims that Productions agreed to ten telecasts after exercising the Renewal Option, TNN calculates its damage claim to be $400,000 (10

---

[44] Hughes Stip. Test. ¶¶ 31, 34. The substitute programming TNN arranged is set forth on a document called a "broadcast grid schedule," Jt. Trial Ex. 24, which was attached to an e-mail dated November 9, 2001 sent by a TNN employee named Harper Grubbs to Hughes. Grubbs's e-mail says in part: "In 2001, APBA was originally slotted for Sat 11:00 am, but we moved it Sun 11:30 a.m. It would have run there beginning 9/30/01 and run through 12/2/01. We aired Crank & Chrome on 9/30/01 at 11:30 a.m. and aired (or will air) Advantage Outdoors in its place each Sunday at 11:30 a.m. 10/7/01 -12/2/01." "Crank & Chrome" and "Advantage Outdoors" were the two non-revenue producing shows that TNN took out of its inventory to replace the contemplated APBA Productions telecasts. Hughes Stip. Test. ¶ 34.

x $40,000),[45] a claim reinforced in TNN's view by the provision in the 2000 Agreement that if Productions defaulted and TNN resold the time for an amount less than Productions had agreed to pay, the resulting difference became a "deficiency" and liquidated debt for which Productions confessed liability and consented to the entry of judgment against it.[46]

44.  I have now reached the point in these Findings where I must deal with the irreconcilable conflict between the testimony of Hughes, who swears that in July 2001 Allweiss orally agreed to provide ten telecasts on specified dates and at specified times, and the testimony of Allweiss, who swears that he did not.  These differences are irreconcilable.  There is no third person to come forward to corroborate one account or the other.  Neither account is inherently implausible.  The subsequent conduct of both Hughes and Allweiss is both consistent and inconsistent with the July 2001 events (or lack thereof) to which they have sworn.  Hughes's August 9, 2001 e-mail to Allweiss, referring to Pacisi's letter to Allweiss dated August 7 enclosing the Amendment implementing the Renewal Option, says that letter "reflects our conversations of a few weeks ago," a statement consistent with Hughes's testimony (although also self-serving).  And Hughes set aside the specified dates and times on TNN's broadcast schedule, an act consistent with his belief, to which he testified, that Allweiss had agreed to them.  But what are we to make of Hughes's apparent total failure to inquire or otherwise follow up when Allweiss did not sign and return the executed Amendment specifying those dates and times?  Ms. Pacisi of TNN's legal department understood perfectly well (as Hughes surely understood) that the 2000 Agreement could be amended "only by a written instrument duly executed by all parties"; her August 7, 2001 letter to Allweiss enclosing

---

[45]  Hughes Stip. Test. ¶¶ 32, 33.

[46]  Hughes Stip. Test. ¶ 30; Jt. Trial Ex. 2, General Terms and Conditions ¶ 17.

three originals of the Renewal Option Amendment asked him to "sign each of the originals and return them to my attention," promising that Allweiss would "receive an original for your files." Allweiss does not sit right down, sign the Amendment, and return it to Pacisi or anyone else at TNN. The last three weeks of August come and go; no signed Amendment from Allweiss. The first three weeks of September come and go; the date of the first telecast draws nigh; no signed Amendment from Allweiss. What Allweiss does is send Hughes the September 21 letter, stating that "we never reached a formal agreement regarding the dates and times for the APBA Offshore programs," throwing TNN overboard, and wishing Hughes and TNN "the best of luck."

45. As for Allweiss, he denies that he agreed with Hughes about the specific number, dates or times of the 2001 telecasts, during conversations in July or at any other time, and his failure to sign the Amendment is consistent with that denial; but what are we to make of Allweiss's silence after receiving the August 7 letter from Pacisi and the Amendment setting forth those specifics, immediately followed by Hughes's August 9 e-mail asserting that the dates and times of the telecasts described in the Amendment reflect "our conversations of a few weeks ago?" Allweiss and Hughes continued to exchange e-mails during mid-August about possible different contractual relationships, *see* Finding of Fact 38; but surely one would expect that if, as Allweiss now claims, Hughes made up a July oral agreement out of whole cloth, Allweiss would have been quick to respond to Pacisi and/or Hughes in early August, in substance: "What are you talking about? What conversations? What agreement? Why are you sending me this Amendment and asking me to commit Productions to telecasts, dates and times of telecasts for which I have never agreed?"

46. On the basis of the evidence before me, I find that Allweiss, having exercised the Renewal Option on March 1, 2001, had conversations with Hughes during July on the subject of the

number, dates and times of the 2001 telecasts that would appear on TNN in fulfillment of that exercised option. It is reasonable to infer that such conversations took place at that time, because the Renewal Option provided that "[t]he dates and times of such telecasts shall be mutually agreed by the parties hereto," with the programming to begin on October 1, 2001, only three months away. I further find that Allweiss made statements to Hughes during those July conversations that, to put it no higher than this, caused Hughes to believe that Allweiss had agreed to the dates and times of the 2001 telecasts that TNN then included in the written Amendment TNN sent to Allweiss on August 7. There is no other rational explanation for Hughes's action in reserving those time spots on TNN's broadcast schedule. Those scheduling reservations had two related but separate effects: they reserved the times for Productions' telecasts; and they removed the times from the network's broadcasting capabilities which TNN salesmen would otherwise have been able to offer to other programmers. I regard it as fanciful to suggest that an experienced cable network executive like Brian Hughes, having made up out of whole cloth a programmer's agreement to buy and use network time, would then set aside and reserve network time for a programming commitment that was never made. That is in effect the finding the defendants ask me to make, and I decline to do so.

47. In February 2000, the LLC became the licensee from APBA with respect to the operation and marketing of the offshore racing category. *See* Finding of Fact 13. In February or March of 2003, the license between APBA and the LLC was terminated, and APBA entered into a different license with an entity called Khaman Holdings, Inc. ("Khaman"). Certain individuals connected with APBA had purported to terminate the LLC's license. The LLC sued them on the theory that they lacked authority to do so. Litigation erupted in Florida and New York. The way that litigation "ended up getting resolved was APBA just simply entered into a new agreement with – under totally

different terms with a new entity." That entity was Khaman, "which currently holds a license with APBA" to "operate, manage, market and sell the sport of offshore racing for APBA."[47]

48. On January 7, 2004, Allweiss, signing as "the Incorporator" articles of amendment to the articles of incorporation of Khaman, caused the Florida Division of Corporations to change the name of that corporation to "APBA Offshore Racing, Inc." Khaman's articles of incorporation had listed Allweiss as its registered agent, at the address of his St. Petersburg, Florida law firm.[48] The Khaman articles of incorporation also gave the address of Allweiss's firm as the mailing address and street address of the corporation, and identified Allweiss as one of the four initial directors, again at his law firm's address, with the title of "President/Secretary." The January 2004 amendments to Khaman's articles of incorporation, in addition to changing the corporation's name, identified its registered agent as an individual in Orlando, Florida, and the corporate mailing and street addresses in Merritt Island, Florida. Allweiss's name no longer appears as an officer or director.[49]

49. As of March 6, 2000, no funds remained in Productions' bank account because Allweiss had drawn them all out. *See* Finding of Fact 14. As of December 3, 2003, when Allweiss gave his deposition, the LLC's assets were "very, very limited," and the corporation was as a practical matter

---

[47] Allweiss Dep. Tr. 267-278.

[48] That address is 100 Second Avenue South, Suite 704s, St. Petersburg, Florida 33701. In the correspondence between Allweiss and TNN in 2001, described in Findings of Fact 22-26, Allweiss used stationery with the letterhead of "APBA Offshore Racing" (a/k/a "the LLC"), with an address of 111 Second Avenue NE, Suite 620, St. Petersburg Florida 33701, and TNN responded to Allweiss at that address. At that time, this was the address of Allweiss, Allweiss & Tetreault, Allweiss's law firm. *See* exhibit to deposition of Lynn T. Eason, Bates No. APBA 000159. Accordingly the assertions in Network's trial brief that at all pertinent times Productions, the LLC and Khaman were located "at the same address as Allweiss's law practice," *id*. at 5 n.4, are correct. I do not regard the establishment of Khaman as relevant to the issues in the case.

[49] Jt. Trial Ex. 25.

insolvent.[50]

### III. CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this case and personal jurisdiction over the parties.

2. The first question of law presented by the case is whether plaintiff Network and defendant Productions entered into an agreement which is enforceable by Network.

3. Network asserts two claims sounding in contract. The first alleges that Productions, having exercised the Renewal Option in the 2000 Time Buy Agreement, breached that Agreement as extended by the Renewal Option by failing to provide Network with offshore racing programming during 2001. In aid of that claim, Network alleges that it and Productions "mutually agreed that [Productions'] programs would run for 10 weeks on consecutive Sundays at 11:30 A.M. beginning on September 30, 2001." Amended Complaint, ¶ 37. Network's second claim alleges that Productions breached its implied duty of good faith and fair dealing in respect of the air times and dates for its 2001 programming under the Renewal Option.

4. Network is precluded as a matter of law from claiming that Productions entered into a final, fully executed formal agreement for 2001 programming. The Renewal Option contemplated further negotiations with respect to the dates and times of the 2001 telecasts. That is the only construction that can be placed upon the provision in the Renewal Option that "[t]he dates and times of such telecasts shall be mutually agreed by the parties hereto." Moreover, the 2000 Agreement, which contained the Renewal Option, expressly provided that the dates and times of the telecasts were material terms that could be amended only by a written instrument executed by both parties.

---

[50] Allweiss Dep. Tr. 277-78.

Network correctly characterized the document it presented to Productions on August 7, 2001, specifying the dates and times for the 2001 telecasts, as an "amendment" to the 2000 Agreement. Productions did not sign that amendment. That omission is fatal to any contention by Network that Productions was bound by a formal written instrument to telecast any particular number of programs on any particular dates and at any particular times of day during the 2001 offshore racing season.

5. In consequence, the case turns upon whether the proof at trial establishes the existence of a *preliminary agreement* which Network may enforce against Productions. Second Circuit case law recognizes the existence of binding preliminary agreements in certain circumstances. The concept of a binding preliminary agreement was first formulated by District Judge Leval (as he then was) in *Teachers Insurance and Annuity Association of America v. Tribune Company*, 670 F.Supp. 491 (S.D.N.Y. 1987), a formula subsequently applied by the Second Circuit in *Arcadian Phosphates, Inc. v. Arcadian Corp.*; 884 F.2d 69 (2d Cir. 1989), *Adjustrite Systems, Inc. v. GAB Business Services, Inc.* 145 F.3d 543 (2d Cir. 1998); and *Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005). In terminology analogous to medical diagnostic parlance, the law of the circuit divides binding preliminary agreements into "Type I" and "Type II." Most recently, the Second Circuit, construing New York law, has said:

> Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. . . . In some circumstances, however, preliminary agreements can create binding obligations. The extent of the obligations created depend upon the preliminary agreement in question, though, in general, binding preliminary agreements fall into one of two categories. These two types are most authoritatively described in *Tribune*, where Judge Leval, collecting the relevant New York law, describes "Type I" preliminary agreements as complete, reflecting a meeting of the minds on all the issues perceived to require negotiation. Because it is complete, a Type I preliminary agreement

binds both sides to their ultimate contractual objective. "Type II" preliminary agreements, by contrast, are binding only to a certain degree, reflecting agreement on certain major terms, but leaving other terms for further negotiation. Type II agreements do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate in good faith in an attempt to reach the objective within the agreed framework.

*Brown*, 420 F.3d at 153 (citing and quoting *Tribune* and *Adjustrite*) (internal quotation marks, ellipses, and bracketed alterations omitted).

6. Whether a Type I or a Type II or no preliminary agreement exists depends, in the last analysis, upon the parties' intentions. "Because this case involves enforcement of an alleged contract, the intentions of the parties are at issue." *Brown*, 420 F.3d at 152. Expanding on that theme, the Second Circuit said in *Brown*:

In *Tribune*, Judge Leval identified two core, but often competing, policy concerns relevant to preliminary agreements. The first is to avoid trapping parties in surprise contractual obligations that they never intended. The second is the enforcement and reservation of agreements that were intended as binding, despite a need for further documentation or further negotiation. The path between this Scylla and Charybdis is, of course, to enforce a preliminary agreement only to the extent they intend it to be binding.

*Id*. at 156-57 (citations and internal quotation marks omitted).

7. Applying this principle to the case at bar, it is immediately apparent that Network has not proved a Type I preliminary agreement which bound Productions to telecast ten programs on particular dates and at particular times. *Brown* instructs that a Type I preliminary agreement must be "complete, reflecting a meeting of the minds on all the issues perceived to require negotiation." It necessarily follows that "there is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future

preparation and execution of contract documents." The category of Type I preliminary agreements "is, then, limited to agreements that are 'preliminary' in name only." Because a Type I preliminary agreement is complete, it "binds both sides to their ultimate contractual objective." *Brown*, 420 F.3d at 153-54 (citations and internal quotation marks omitted). The "ultimate contractual objective" in the case at bar was a programming schedule for 2001 which specified the number of telecasts and the dates and hours of their display. The Renewal Option in the 2000 Agreement and its exercise by Allweiss on March 1, 2001 left all these material terms for future agreement by the parties. I have found that, subsequent to his March 1 exercise of the Renewal Option, Allweiss had conversations with Hughes which caused Hughes to believe that agreement on these terms had been reached. *See* Finding of Fact 46. But this oral exchange cannot create a Type I preliminary agreement enforceable by Network as to the "ultimate contractual objective" as above described. Of the "four factors relevant to determining whether a preliminary agreement is enforceable as to the 'ultimate contractual objective,'" the first factor, "frequently the most important," is "whether there is an expressed reservation of the right not to be bound in the absence of a writing." *Brown*, 420 F.3d at 154 (citing *Adjustrite*, 145 F.3d at 549). That expressed reservation is found in the 2000 Agreement's requirement that amendments take the form of "a written instrument duly executed by all parties," a requirement acknowledged by Network's legal department when on August 7, 2001 Pacisi sent Allweiss the written amendment specifying the programming details and asking Allweiss to sign and return it.[51]

---

[51] The other three factors relevant to the existence of a Type I preliminary agreement are "(2) whether there has been partial performance of the contract; (3) whether all the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type pf contract that is usually committed to writing." *Brown*, 420 F.3d at 154. I need not discuss each of these additional factors in detail, but do observe that for the reasons stated in text the third factor also

8.   Accordingly the case turns upon whether Network has proved the existence of an enforceable  Type II preliminary agreement with Productions.  A Type II preliminary agreement is different in kind and effect from a Type I agreement.  It is again instructive to quote from the Second Circuit's opinion in *Brown*:

> While a Type I preliminary agreement is fully binding as to the final contractual goal, a Type II agreement does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework.  This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. . . . The essence of a Type II preliminary agreement is that it creates an obligation to negotiate the open issues in good faith in an attempt to reach the ultimate contractual agreement within the agreed framework.

420 F.3d at 157 (citations, internal quotation marks and brackets omitted).

9.   The considerations relevant to whether a preliminary agreement is a binding Type II agreement are:

> (1) whether the intent to be bound is revealed by the language of the agreement;
> (2) the context of the negotiations;
> (3) the existence of open terms;
> (4) partial performance; and
> (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Brown*, 420 F.3d at 157 (citations omitted).  These factors bear some resemblance to those  relevant to the existence of a Type I agreement, *see* Conclusion of Law 7 and accompanying footnote, but the court's analysis and the result reached may be different.  In  *Brown* the Second Circuit went on to

---

militates against a conclusion that Network and Productions entered into a Type I preliminary agreement.

say:

> While some of these factors are the same as those applied to whether a document is a Type I preliminary agreement, they have a somewhat different significance where the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms. More to the point, if the question posed is whether the parties have agreed to proceed within an open framework toward a contractual goal, leaving necessary terms for later negotiation, rather than whether the parties have agreed to achieve the ultimate contractual goal, then the language of the agreement, its contents and omissions, and the context in which it was negotiated and signed, may lead to different conclusions.

*Id.*

10.    The possibility of "different conclusions" is illustrated by *Brown* itself. The key document was a Memorandum of Understanding ("MOU") by which the parties agreed to "work together to develop, build, market and manage a new real estate venture planned for an existing site at 100 Jay Street in Brooklyn, N.Y." 420 F.3d at 151. Thereafter "the parties attempted to negotiate the necessary corporate, financing, construction, and operating agreements," but the defendant's displeasure with a proposed construction management agreement became "so deep that he refused to continue with negotiations and ceased all communications and collaboration" with the plaintiff. *Id.* at 152. On defendant's motion for summary judgment, the district court concluded that the MOU was not an enforceable preliminary agreement because it did not satisfy the requirements of either a Type I or a Type II agreement. The Second Circuit affirmed on the first conclusion, but reversed on the second:

> We agree with the lower courts that the MOU is not a binding Type I preliminary agreement. We hold, however, that the intention of the parties to create a "Type II" preliminary agreement is patent in the language of the MOU, presenting us with a pure issue of law. . . . We hold that the MOU is a Type II preliminary agreement binding the

parties to negotiate in good faith terms necessary to pursue joint development of the Jay Street Property.

*Id*. at 156, 159.

11.   The obligation to negotiate in good faith that a Type II preliminary agreement would otherwise impose upon a party may, of course, be negated by a sufficiently clear expression that the parties are not bound to each other in any way until a formal written contract is executed by both.   In the World of Contracts, Intent is King.   Judge Cote recently dealt with this reality in *Beekman Investment Partners, L.P. v. Alene Candles, Inc.*, No. 05 Civ. 8746, 2006 WL 330323 (S.D.N.Y. Feb. 14, 2006).   The case arose out of negotiations for the purchase by plaintiff Beekman of all the stock of the corporate defendant Alene from its sole shareholder, one Amato, the individual defendant. Amato and the CEO of Beekman signed a letter of intent dated April 19, 2005 ("LOI") which set forth a detailed summary of proposed terms.   However, the next to last paragraph of the LOI provided:

> The above terms do not constitute a definitive offer, acceptance, contract, or agreement, all of which require the completion of our due diligence and will be incorporated in a definitive purchase agreement duly executed by the Seller and Beekman.

2006 WL 330323, at *1.   The final paragraph of the LOI began:

> We are prepared to commit the resources to finalize our due diligence, negotiate a definitive purchase agreement and close a transaction by June 30th.

*Id*.   The parties never executed a purchase agreement, nor did the planned transaction occur. Beekman sued the defendants for, *inter alia*, breach of contract and breach of the implied covenant of good faith and fair dealing.   Judge Cote granted the defendants' motion to dismiss the complaint. Beekman's claim for breach of contract failed because of the quoted disclaimer in the next to last paragraph of the LOI.   As for the good faith and fair dealing claim, Judge Cote noted while Beekman

31

did not specifically assert that the LOI constituted a Type II preliminary agreement under *Brown* and *Adjustrite,* the assertion would have failed in any event:

> Thus, even if the LOI did not contractually bind the parties to its specific terms, Beekman might still have stated a claim for breach of this duty of good faith if the LOI constituted a Type II preliminary agreement. Unfortunately for Beekman, however, the LOI is not a Type II agreement for the same reason that it is not a Type I agreement. When deciding whether a preliminary agreement of either type exists, the key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent. The LOI, as discussed above, contains an explicit statement of the parties' intent not to be bound in any way (except to the terms of the exclusivity agreement, where a contrary intent was expressly stated). Whether the statement that the parties "have a strong interest in moving forward in good faith" would suffice on its own to signal an intent to create a contractual obligation is uncertain; that it does not when it immediately follows an expression of intent not to be bound, as it does in the LOI, is clear. There being no agreement of any kind that would give rise to a duty to act in good faith, summary judgment is granted with respect to plaintiff's second cause of action.

2006 WL 330323, at *7.

12.  In the case at bar, I conclude that the parties intended to and did create a Type II preliminary agreement. That intention is patent in the language of the agreement into which the parties unquestionably entered and their conduct within the context of that agreement. I am thus presented with "a pure question of law." *Brown*, 420 F.3d at 156.

13.  Unlike *Beekman*, there is in this case no "explicit statement of the parties' intent not to be bound in any way" until the execution of a subsequent document. On the contrary: the 2000 Agreement between TNN and Productions was executed by both parties and the scheduled programming for the 2000 offshore power boat racing season fully performed and paid for. The Renewal Option was a part of the 2000 Agreement and consequently also binding upon both parties.

32

On March 1, 2001 Allweiss caused the Productions/LLC corporate entity[52] to exercise the Renewal Option. If Allweiss had let the option lapse, TNN/Network would have had no ground to complain; but the exercise of the option obligated TNN to commit the time to broadcast the 2001 racing season telecasts, and obligated Productions/LLC to produce the telecasts and pay for the broadcast time. To be sure, the Renewal Option required that the number of telecasts ("up to thirteen") and their dates and times be "mutually agreed by the parties hereto," so that the renewal agreement was in those respects preliminary. However, I conclude that the parties at bar intended to create a Type II preliminary agreement, with the result that they were bound to negotiate in good faith terms necessary to achieve the ultimate contractual objective of telecasting the 2001 racing season. I reach the same result in this case that the Second Circuit did in *Brown*, where the court concluded that while the parties' memorandum of understanding could not be read as agreeing upon all the necessary elements of the property development project and consequently did not qualify as a Type I preliminary agreement, "Type II agreements, by definition, comprehend the necessity of future negotiations and contracts," and the Type II agreement the parties intended created "an obligation for defendants to negotiate in good faith these and other terms within the broader framework." 420 F.3d at 158-59.

14. While the several factors listed in Conclusion of Law 9, *supra*, must be considered in context, they are useful signposts in the sea, and on balance militate in favor of a conclusion that the parties entered into a binding Part II preliminary agreement in respect of telecasting the 2001 racing season. I consider those factors in turn.

     (1) *The language of the agreement* does not, as pointed out in Conclusion of Law 13,

---

[52] I use that hybrid designation because, as stated in Findings of Fact 13-19, by this time Productions had become inactive and its functions taken over by the LLC, although Allweiss did not tell that to Hughes or anyone else at TNN.

and unlike the letter of intent in the *Beekman* case, explicitly state that the parties were not bound in any way to anything until a purchase agreement was subsequently executed. The 2001 season Renewal Option provided only that "the dates and times of such telecasts shall be mutually agreed to by the parties hereto." That language is entirely consistent with the obligation to negotiate open issues in good faith that is the touchstone of a Type II preliminary agreement under Second Circuit precedent, and is equally consistent with the more general proposition that "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995).

(2) *The context of the negotiations,* or to state the relevant consideration more accurately, the Renewal Option itself, demonstrates the intent of the parties to negotiate a general framework for the telecasting by TNN of the 2001 offshore racing season if Productions/LLC exercised the option, as in fact it did.

(3) *The existence of open terms* was limited. The Renewal Option specified that if the option was exercised, the resulting additional telecasts would be exhibited "from October 1, 2001 through December 31, 2001," at a fee of $40,000 per episode. Those basic terms were pre-agreed in the Renewal Option. The remaining open issues, while material, were readily amenable to agreement through negotiations conducted in mutual good faith.

(4) *Partial performance* was engaged in by TNN, which reserved the dates and times contained in the amendment forwarded by Pacisi to Allweiss on August 7, 2001, and was unable to fill them with revenue-producing substitute programming when Allweiss delayed his abandonment of the project until September 21.

(5) *The necessity of putting the agreement in final form* is attested to by the provision

in the 2000 Agreement that all amendments had to be in writing and executed by both parties. But that consideration, standing alone, is not fatal to the existence of a Part II preliminary agreement, which as noted typically contemplates the necessity of future agreements. There is no proof in the record of a customary form of binding preliminary agreement in the cable television network business.

15. For the foregoing reasons, I conclude that the parties entered into a binding Type II preliminary agreement which obligated them to negotiate in good faith the number, dates and times of the 2001 season telecasts. The question then becomes whether the corporate defendant acted in good faith in that regard. In *Brown*, which arose on a motion for summary judgment, the Second Circuit said at the end of its analysis: "Whether the differences that have terminated the parties' working relationship in this case reflect good faith is a question for the District Court on remand." 420 F.3d at 157. In the case at bar, a plenary trial has been held. The conclusion is inescapable that not only did Productions/LCC fail to negotiate these terms in good faith, it failed and refused to negotiate them at all. It follows that the corporate defendant breached the Type II preliminary agreement between the parties.[53]

16. Allweiss's testimony and affidavit, quoted in Findings of Fact 39 and 40, make it crystal clear that his game plan (one hesitates to dignify it with the phrase "business plan") was to obtain an entirely new contract with TNN/Network on terms more favorable to Productions/LLC. Allweiss exercised the Renewal Option to use as a pawn in his ongoing commercial chess game with Hughes. Allweiss acknowledges that strategy in his affidavit at ¶ 13: "I caused the execution of the Renewal

---

[53] To the extent that this and succeeding Conclusions of Law may include Findings of Fact, they should be construed as Further Findings.

Option Rider because I wanted to make sure that Network would continue its dialogue with me regarding the possibility of reaching a more extensive agreement than that set forth in the Renewal Option Rider." In Allweiss's perception, "we controlled the option," and if "the deal for the future was good" he would have agreed to it, but if Network did not offer a new deal acceptable to Allweiss, "My fallback position was: Well, if we can't agree on dates and times for these 13 shows that are going to air, then we don't have a deal and we're out of here." Allweiss, an attorney, advised himself that so long as he did not agree to the dates and times of the telecasts called for by the option he "controlled," the corporate defendant was under no contractual obligation to the plaintiff. He made that legal opinion plain in a lecture he gave to plaintiff's counsel during the deposition:

> It [the Renewal Option] says, clearly and unambiguously, that the parties have to mutually agree to the dates and times of the future programs. When you go to the front of the contract, it defines dates and times as material terms. Under the law, if you have not agreed or the –your – contract ends up being contingent upon the mutual assent upon a material term, you don't have a contract. That's not subject to my interpretation. That's the law.[54]

Allweiss was either unaware of the contractual obligation to negotiate open terms in good faith generated by a Type II preliminary agreement, as articulated by the Second Circuit in cases construing the governing New York law, or he chose to disregard that obligation.

17. Given Allweiss's view that he could avoid any further contractual obligation to Network by the simple expedient of refusing to agree to the dates and times of the 2001 telecasts, it is not surprising that his testimony does not describe any effort on his part to negotiate an agreement. Network's theory of the case is that during discussions in July 2001, Hughes and Allweiss agreed on the dates and times that were incorporated in the August 7 amendment Pacisi mailed to Allweiss.

---

[54] Allweiss Dep. Tr. 233.

Allweiss not only denies making such an oral agreement, he denies entering into any substantive discussion with Hughes on the subject. At Allweiss's deposition, counsel asked: "Now going back to the July conversation with Brian, what was he saying to you, as best you can recall, and what were you saying to him? What were the nature of the conversations?" "For the most part," Allweiss responded, "they were very brief and they were pretty well-oriented to my asking Brian, 'When are we going to get a new deal?'" The desired "new deal" was the only subject Allweiss was interested in. Counsel sharpened the focus on the 2001 programming under the Renewal Option. "With respect to the 2001 programming," counsel asked, "did Brian raise with you the issue of a need to set the dates and times," and when Allweiss answered "yes," counsel followed up by asking: "Did you get a sense of his urgency?" Allweiss made this revealing response:

> I started to get a sense of his urgency back in July when it was pretty clear that he wasn't going to be able to give me an answer on what the future was *and I wasn't giving him an answer on what our dates and times were going to be*.

Allweiss Dep. Tr. 214 (emphasis added). Allweiss, according to his testimony, was not giving Hughes any answers on the dates and times of the 2001 telecasts because he was trying to leverage the exercised Renewal Option into a new and more favorable future deal; and, when that effort failed, Allweiss simply pulled the plug (so to speak) on Network and entered into a contract with a competitor. The corporate defendant's breach of its contractual obligation to negotiate in good faith the open terms within the framework of the 2001 programming is manifest.[55]

---

[55] In Finding of Fact 46, I drew the inference that Hughes and Allweiss had substantive discussions in July 2001 which "caused Hughes to believe that Allweiss had agreed to the dates and ties of the 2001 telecasts that TNN then included in the written Amendment TNN sent to Allweiss on August 7." If instead I were to credit Allweiss's testimony that no such discussions took place, the defendant's position would not be enhanced: on the contrary, it would simply mean that the defendant's breach of its obligation to negotiate in good faith was total, not partial.

18.   Since the obligation to negotiate a contract in good faith does not guarantee that a final contract would be concluded if both parties complied with that obligation, the calculation of damages caused by a breach may in some circumstances be problematical.   But the calculation is simple enough in the case at bar.   The Renewal Option itself, which formed a part of an existing and fully executed contract, provided that the 2001 programming would be accomplished between October 1 and December 31, 2001.  Its references to "up to thirteen (13) additional original Episodes" under "the same terms and conditions" as contained in the 2000 Agreement clearly contemplate that each episode would last 30 minutes, which was the 2000 protocol.  The Renewal Option also provided for the fee of $40,000 per episode.  Given the apparent ease with which the parties agreed on the dates and times for the 2000 programming, I find and conclude without difficulty that if Allweiss had negotiated in good faith with Network, the dates and times of at least ten 2001 weekend telecasts would have been agreed upon.[56]  It follows that Network has proved damages in the total amount of $400,000 resulting from defendant's breach of its obligation to negotiate in good faith.  Plaintiff is entitled to a judgment in that amount against Productions, the only corporate defendant before the Court: a judgment which, the trial evidence indicates, will almost certainly prove to be uncollectible.

19.   The remaining question is whether Allweiss is personally liable for plaintiff's judgment against Productions, the corporate defendant.  To use current legal parlance, the issue is whether Productions' corporate veil should be pierced in order to hold Allweiss accountable for the corporation's indebtedness to Network.  New York law governs.

---

[56]   There is, of course, no evidence available to defendant that Allweiss made good faith suggestions about 2001 programming dates and times to TNN/Network which the latter rejected. As noted in text, Allweiss had no interest in 2001 programming on 2000 Agreement terms.  His purpose was to obtain a more favorable future deal from the network, failing which he  would cast the plaintiff network over the side.

20. "Under New York law, a court may pierce the corporate veil where 1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (citation and internal quotation marks omitted). "Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, pierce the corporate veil, whenever necessary to prevent fraud or to achieve equity." *Walkovsky v. Carlton*, 18 N.Y.2d 414, 417 (1966) (citation and internal quotation marks omitted). "The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Morris v. New York State Department of Taxation and Finance*, 82 N.Y.2d 135, 142 (1993). The domination required by the New York cases to justify corporate veil piercing "need not be complete as to every detail but must only be complete in respect to the transaction attacked." *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985) (citation, internal quotation marks and ellipses omitted). Nor need that domination constitute "fraud" upon a plaintiff; it is sufficient that the domination of the defendant corporation operated "to perpetrate the violation of a positive legal duty or a dishonest or unjust act in contravention of plaintiff's legal rights." *Id*. (citation and internal quotation marks omitted). "Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F. 2d 131, 138 (2d Cir.

1991).[57]

21. Applying these principles to the case at bar, the question becomes whether Allweiss, by his exercise of domination over Productions, caused Productions to violate its contractual obligation to negotiate in good faith with Network about the open terms of the Renewal Option, thereby depriving Network of its legal right to mutual good negotiations. I have determined *supra* that Productions owed Network an obligation to negotiate in good faith, that Productions violated that obligation, and that Network's resulting damages may be calculated with sufficient certainty. This Court, sitting in equity, will intervene and visit personal liability upon Allweiss for Network's resulting loss if the trial evidence shows that Allweiss's domination of Productions caused the corporation to violate that obligation with respect to that particular transaction.

22. On the issue of domination over a corporate defendant, the Second Circuit, construing New York law, has said that veil-piercing is a fact specific inquiry and courts consider many factors, including: "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." *MAG Portfolio*, 268 F.3d at 63. It will be noted that several of these factors are more relevant to

---

[57] While *Passalacqua* considered whether a parent corporation should be held responsible for the debt of a subsidiary, the same test governs the liability of a stockholder for a corporation's debt. "[C]ontrol, whether of the subsidiaries by the parent or the corporation by its stockholders, is the key; the control must be used to commit a fraud or other wrong that causes plaintiff's loss." *Passalacqua*, 933 F.2d at 138 (citations omitted).

whether a subsidiary corporation's veil should be pierced to reach the parent corporation, than they are to the issue presented in the case at bar, whether a corporation's veil should be pierced to reach an individual.

23. Because "disregarding corporate separateness as an equitable remedy is one that differs with the circumstances of each case," *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988), no single factor or even combination of factors is dispositive. "[T]he general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result." *William Wrigley Jr. Corp. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989).

24. Allweiss says in his first affidavit at ¶¶ 2-10 that his primary Florida "residence address" has never been the same as the address of Productions; "proper corporate records and minutes for Productions were kept and regular meetings held"; he was never paid any salary or commissions by Productions; he invested a total of $160,000 in Productions, "only a portion of which has been repaid to me" and he has not received or taken any other funds out of Productions; Productions' financial assets were kept separate "from my own financial assets and from the assets of any other entity in which I had any interest"; and he never used any money or other assets of Productions for personal purposes.

25. Allweiss's post-trial brief asserts at 17-18 that "Productions was a start-up company," and cites *Wrigley* for the proposition that in small privately held corporations, the "trappings of sophisticated corporate life are rarely present." 890 F.2d at 601. However, the brief's quotations from *Wrigley* are selective. They do not include the Second Circuit's observations that factors such as "insolvency at the time of a transaction" and "nonfunctioning of other officers and directors," either individually or in combination, "may evidence a corporation that is a mere shell and therefore

susceptible to being bypassed in fashioning an appropriate remedy." *Id*. Those observations resonate

in the case at bar because (a) at the time of Allweiss's exercise of the Renewal Option in March 2001,

he had stripped all of Productions of all its assets and transferred them to the LLC (although he had

not told Hughes or TNN that), and (b) while corporate meetings were held and minutes kept, the

minutes of Productions' organizational meeting on February 24, 1999 and its annual meetings on

February 25, 2000, February 23, 2001, and February 22, 2002, indicate that Allweiss, as sole corporate

officer, director, and shareholder, conducted these meetings sitting all by himself in his St. Petersburg

law office.[58] No suggestions were made, resolutions offered, votes requested, or objections voiced

by anyone else at the corporate meetings because there wasn't anyone else.[59]

26. I accept that some of the general factors courts consider as relevant to corporate veil-

piercing do not militate in favor of doing so in this case. There is no evidence, for example, that

Allweiss intermingled Productions' assets with his own personal assets; the reality is that Allweiss

put his own money into Productions, then took it out again, and transferred his funds to the LLC,

which had also attracted some additional investors. However, the single most relevant factor is

Allweiss's "complete domination over the corporation *with respect to the transaction at issue*," *MAG

Portfolio*, 268 F.3d at 63 (emphasis added), namely, the exercise of the Renewal Option and the

---

[58] *See* exhibits to Eason dep., Bates Nos. APBA 000185, 000186, 000187, 000178, 000179, 000188, 000189, 000190, 000191, 000192, 000180, 000193, 000194, 000195, 000181, 000182, 000196, 000183, 000197, 000184, and 000198.

[59] In *Wrigley*, upon which Allweiss principally relies, the Second Circuit, reversing the district court's veil piercing, declared itself "unable to isolate any evidence which warrants, in our view, the district court's decision to pierce the corporate veil and impose personal liability on Eric Waters," but also noted that the bench trial record "suggests that the issue was barely the focus of the court's or the litigants' attention and was apparently only broached" in the plaintiff's reply post-trial brief. 890 F.2d at 601. *Wrigley* cannot be regarded as a ringing appellate declaration that equity should refrain from veil piercing on the evidence adduced at the trial of the instant case.

negotiation of its terms. With respect to that transaction, Allweiss's domination of Productions was total. Allweiss devised the game plan alone and executed it alone, refused to negotiate with Network in good faith, did not advise Network that Productions had ceased actively conducting business and had been stripped of its assets,[60] and ultimately gave the 2001 programming to a competitor when he failed to achieve a different and more advantageous deal from Network. So I cannot accept the contention in Allweiss's brief at 19 that "[t]here is no evidence that Allweiss improperly dominated or controlled Productions, or did anything other than run a solely-owned company in a manner suited to the demands of the business." That contention is necessarily based on the premise, asserted in defendants' brief at 20, that "there was no legally enforceable contract and thus no breach of contract occurred." But the premise is false. Productions was contractually obligated to negotiate with Network in good faith the open terms of the Renewal Option. By his domination of the corporation, Allweiss procured the breach of that obligation. Equity requires that Allweiss be held personally liable for Network's resulting loss.

## IV. CONCLUSION

---

[60] In point of fact, Allweiss had stripped Productions of its assets before August 2000, when TNN and Productions (by Allweiss) signed the 2000 Agreement. *See* Findings of Fact 10, 13,14, and 15. During his deposition, Allweiss was asked if he had "any hesitancy in signing an agreement on behalf of Productions, knowing you didn't have the assets to satisfy the obligation?" Allweiss responded that "I signed the contract that was given to me by TNN"; that, "given the opportunity, your client [TNN] wrote it [the name of Productions] twice. I just signed it"; and that "at the time I signed it it never crossed my mind that it was troubling or that I was doing anything wrong or that I had a feeling or belief at all that I was signing a contract on behalf of a company that didn't have any money. Okay?" Allweiss Dep. Tr. 161. Well, actually, *not* okay, in the view the Court takes of the case. TNN included the name "Productions" in the 2000 Agreement because its 1999 agreement had been with Productions, and it had no reason to know (because Allweiss did not mention it) that in the interim Productions had become an empty shell. Allweiss is an attorney, and is not convincing when he says he "just signed" a contract with the names filled in by TNN. One wonders what Brian Hughes would have said if, upon receiving the 2000 Agreement as prepared by TNN, Allweiss had told him that Productions was only a shell.

Plaintiff Network Enterprises, Inc. is entitled to a judgment in the amount of $400,000.00 against defendants APBA Offshore Productions, Inc. and Michael D. Allweiss, jointly and severally, with statutory costs in an amount to be taxed by the Clerk.

Counsel for plaintiff are directed to settle a Judgment consistent with this Opinion, Findings of Fact, and Conclusions of Law on or before May 31, 2006 and on ten (10) calendar days' notice.

It is SO ORDERED.

Dated: New York, New York
      April 20, 2006

 

 

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Zumwalt to determine Defendants' conduct served to diminish Price's creative output, and, if it finds such effect occurred, to determine Plaintiffs' resulting economic loss on the basis of the fact witnesses available to Plaintiffs and the Court's instructions on the law of damages in copyright infringement cases.

The two most recent cases in the Second Circuit, *Nimely* and *Ruggiero*, applied these gatekeeping criteria and held that the opinions of the experts in question were inadmissible. These cases are fact-intensive and I need not discuss *Nimely* and *Ruggiero* in further detail. It is sufficient to say in this case that, for the foregoing reasons, I conclude that Zumwalt's proffered expert testimony is inadmissible, and I preclude it in its entirety.

It is SO ORDERED.

Dated: New York, New York
        May 11, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE